Keith H. Wofford (KW-2225)
Anne H. Pak (AP-3641)
ROPES & GRAY LLP
45 Rockefeller Plaza
New York, New York 10111-0087
Tel: 212-841-5700
Fax: 212-841-5725

Ira H. Goldman (IG-5192)
Corrine L. Burnick (CB-9072)
Marie C. Pollio (MP-2664)
SHIPMAN & GOODWIN LLP
One Constitution Plaza
Hartford, CT 06103-1919
Telephone: 860-251-5000
Facsimile: 860-251-5312

Attorneys for U.S. Bank National Association,
As Trustee

MISC 06 049ML

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

U.S. Bank National Association, as Trustee,

*Plaintiff,*

v.

PMCC Calpine New England Investment LLC
and PMCC Calpine NEIM LLC,

*Defendants.*

Civil Action No. ________________

**COMPLAINT**

This action is brought by Plaintiff U.S. Bank National Association, in its capacity as Trustee, to recover approximately $363.5 million in outstanding principal plus additional amounts owed by Defendant PMCC Calpine New England Investment LLC

under two secured promissory notes. The Indenture Trustee also seeks equitable relief, including the immediate appointment of a receiver to take possession, manage, operate and, ultimately, sell two power plants located in Tiverton, Rhode Island and Rumford, Maine, each of which has 265 megawatts of generating capacity.

## PRELIMINARY STATEMENT

1. In December, 2000, Defendant PMCC Calpine New England Investment LLC ("PMCC" or the "Owner Lessor") issued two secured promissory notes in aggregate original principal amount of $366 million to a Pass Through Trustee for the benefit of certain holders of certificates (the "Holders") in a Pass Through Trust. Defendants used the proceeds of the notes to acquire two power plants pursuant to certain sale-leaseback arrangements with two wholly-owned indirect subsidiaries of Calpine Corporation ("Calpine"). To secure repayment of the promissory notes the Owner Lessor, among other things, pledged and assigned to the Indenture Trustee the power plants and the "rent" payments due under certain so-called Facility Lease Agreements with the Calpine subsidiaries (the "Facility Leases").[1] In December, 2005, Calpine and its subsidiaries filed for bankruptcy protection. A payment default has been continuing since January, 2006, and no payment has been made on the notes since July, 2005. Operations ceased at the Rumford plant in November, 2005 and at the Tiverton plant in February, 2006, whereupon Calpine and its subsidiaries gave notice of their intent to surrender the plants

[1] Notwithstanding the characterization of the Facility Leases and related transactions herein as leases and/or financings, or statements herein that Owner Lessor owns the Facilities, or any other legal characterizations or factual statements herein, the Trustee and the other parties in the chapter 11 cases of Calpine and its affiliates have reserved their rights with respect to the characterization of these transactions, including without limitation, the potential characterization the Facility Leases as secured financings.

to the Owner Lessor. The Owner Lessor has refused to take possession of the power plants, which remain idle as of the date hereof.

2. By Order to Show Cause, the Trustee is seeking the immediate appointment of James A. Goodman as receiver to take possession, custody and control of the power plants. Such relief is clearly justified on at least two separate grounds. First, PMCC explicitly agreed to the appointment of a receiver upon a payment default and acceleration of the notes. Second, as more fully described below, a receiver is urgently needed to restore operations at the power plants and, thereby, to preserve their value. Courts have repeatedly held that a receiver can and should be appointed where, as here, a receiver is needed to protect assets pledged to secured creditors.

3. The Trustee will suffer irreparable harm if a receiver is not immediately appointed. Among other reasons, the receiver is a necessary party to a transition agreement the Trustee has negotiated with Calpine and its related subsidiaries. This transition agreement provides not only for the surrender of the power plants to a receiver, but also for the transfer to a receiver of certain other assets that will permit the return of the Facilities to service. These assets include, without limitation, the land on which the power plants are located, interconnection facilities that link the power plants to the electricity grid, transformers that modulate the voltages between the grid and the plants, spare parts, emissions credits, key data relating to the plants, and software necessary to monitor the operation of the plants. The failure to appoint a receiver will jeopardize the opportunity to acquire these assets, perhaps causing the power plants to remain idle for some unforeseeable period of time. With each additional day the plants remain idle, the

Trustee suffers mounting economic harm and the power plants are exposed to an ever-increasing risk of physical deterioration and possible damage.

## PARTIES

4. Plaintiff U.S. Bank National Association ("U.S. Bank") is a national banking association with its principal place of business at 800 Nicollet Mall, Minneapolis, Minnesota, 55402. U.S. Bank, as successor in interest to State Street Bank and Trust Company of Connecticut National Association, serves as indenture trustee (the "Indenture Trustee" or "Trustee") and pass through trustee ("Pass Through Trustee") in connection with the leveraged lease financing of two gas-fired combined cycle electric generating facilities, one located in Tiverton, Rhode Island (the "Tiverton Facility") and the other in Rumford, Maine (the "Rumford Facility" and, together with the Tiverton Facility, the "Facilities"). This transaction is commonly referred to as the "Calpine New England 2000 Pass Through Transaction." U.S. Bank files this Complaint in its capacity as Indenture Trustee.

5. Defendant PMCC Calpine New England Investment LLC ("PMCC" or the "Owner Lessor"), is a limited liability company organized under the laws of Delaware with a principal place of business at 225 High Ridge Road, Suite 300, Stamford, Connecticut 06905. The Owner Lessor is a special purpose entity formed solely for the purpose of the Calpine New England 2000 Pass Through Transaction. Upon information and belief, the Trustee is the Owner Lessor's only creditor.

6. Defendant PMCC Calpine NEIM LLC (the "Owner Participant") is a limited liability company organized under the laws of Delaware with a principal place of

business at 225 High Ridge Road, Suite 300, Stamford, Connecticut 06905. The Owner Participant is a special purpose entity formed solely for the purpose of the Calpine New England 2000 Pass Through Transaction. The Owner Participant is the sole member and managing member of the Owner Lessor. The sole member and managing member of the Owner Participant is General Foods Credit Corporation, a Delaware corporation.

## JURISDICTION AND VENUE

7. This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332. There is complete diversity of citizenship between the plaintiff and the defendants, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

8. The Court has personal jurisdiction over the defendants, because the defendants have consented to the jurisdiction of this Court, and because defendants regularly do business in, and this action arises out of a transaction in, the Southern District of New York. Pursuant to Section 14.14 of the Participation Agreement (as defined below), each of the Owner Participant and the Owner Lessor irrevocably consented to the jurisdiction and venue of this Court for the purposes of any suit, action or other proceeding arising in connection with the Calpine New England 2000 Pass Through Transaction, including the claims asserted herein. Pursuant to the foregoing provision, the defendants also waived any objection to the jurisdiction and venue of this Court.

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 and because, as previously noted, the defendants consented to the jurisdiction and venue of this Court pursuant to Section 14.14 of the Participation Agreement (as defined below).

**BACKGROUND**

10. The Trustee, PMCC and the Owner Participant entered into the Calpine New England 2000 Pass Through Transaction on or about December 19, 2000, together with Tiverton Power Associates Limited Partnership, a Rhode Island limited partnership ("Tiverton Power"), Rumford Power Associates Limited Partnership, a Maine limited partnership ("Rumford Power"), and Calpine, a Delaware corporation. The Participation Agreement dated as of December 19, 2000 among Tiverton Power, Rumford Power, PMCC, the Owner Participant, Calpine and the Trustee (the "Participation Agreement") and a series of other related operative documents set forth the terms of the Calpine New England 2000 Pass Through Transaction (collectively, the "Operative Documents"). The Participation Agreement contains certain defined terms that are used in the operative documents governing the Calpine New England 2000 Pass Through Transaction. A true and correct copy of the Participation Agreement is attached hereto as Exhibit A. All capitalized terms not otherwise defined herein have the meanings ascribed to them in the Participation Agreement. The Operative Documents characterize the Calpine New England 2000 Pass Through Transaction as follows (although the Trustee and the other parties to the Transition Agreement (defined below) have reserved their respective rights in the Calpine bankruptcy cases as to the appropriate factual and legal characterization of the Operative Documents; *see supra* n.1).

11. The Owner Lessor issued two promissory notes to the Pass Through Trustee under an Indenture of Trust, Mortgage and Security Agreement dated as of

December 19, 2000 (the "Indenture"). A true and correct copy of the Indenture is attached hereto as Exhibit B. The Owner Lessor executed a promissory note in the original principal amount of $190 million (the "Tiverton Lessor Note") to finance the Tiverton Facility and a promissory note in the original principal amount of $176 million (the "Rumford Lessor Note" and, together with the Tiverton Lessor Note, the "Lessor Notes") to finance the Rumford Facility. As of the date of this Complaint, $188,741,120.23 in principal plus additional amounts is due and unpaid on the Tiverton Lessor Note. A true and correct copy of the Tiverton Lessor Note is attached hereto as Exhibit C. As of the date of this Complaint, $174,833,879.79 in principal plus additional amounts is due and unpaid on the Rumford Lessor Note. A true and correct copy of the Rumford Lessor Note is attached hereto as Exhibit D.

12. The Indenture Trustee has a valid and perfected lien on and security interest in, among other things, the Facilities and the Owner Lessor's rights under and interests in certain Operative Documents (including, without limitation, the Facility Leases), and all proceeds of such collateral. The Trustee's liens and security interests were duly perfected by appropriate public filings. The collateral pledged by the Owner Lessor to the Indenture Trustee to secure the payment of the Lessor Notes is defined in the Operative Documents as the "Indenture Estate."

## THE TRUSTEE'S RIGHTS AND REMEDIES

13. Upon the occurrence of a default under the Indenture, the Trustee has a broad array of rights and remedies at its disposal, including all the remedies available to a

secured party under the Uniform Commercial Code. As set forth in pertinent part in Section 4.3(b) of the Indenture:

> The Indenture Trustee may proceed to enforce the rights of the Indenture Trustee and the Noteholders by directing payment to it of all moneys payable under any agreement or undertaking constituting a part of the Indenture Estate, by proceedings in any court of competent jurisdiction to recover damages for the breach hereof or for the appointment of a receiver or for the sale of all or any part of the Facilities or for foreclosure of the Facilities, together with the Owner Lessor's interest in the Assigned Documents, and by any other action, suit, remedy or proceeding authorized or permitted by this Indenture, at law or in equity, or whether for the specific performance of any agreement contained herein, or for an injunction against the violation of any of the terms hereof, or in aid of the exercise of any power granted hereby or by law, and in addition may foreclose upon, sell, assign, transfer and deliver, from time to time to the extent permitted by Applicable Law, all or any part of the Indenture Estate or any interest therein, at any private sale or public auction with or without demand, advertisement or notice (except as herein required or as may be required by law) of the date, time and place of sale and any adjournment thereof, for cash or credit or other property, for immediate or future delivery or for such price or prices and on such terms as the Indenture Trustee, in its unfettered discretion may determine, or as may be required by law . . . .

The Indenture further provides that the Trustee's remedies are cumulative and that any delay in exercising any remedy does not constitute a waiver of such remedy. Indenture § 4.9.

14. Additionally, upon the occurrence of a cross-default under the Indenture arising from a default under the Facility Leases (a "Facility Lease Cross-Default") by Tiverton Power or Rumford Power (each a "Facility Lessee"), the Trustee is entitled to pursue all applicable remedies of the Owner Lessor under the Facility Leases, including, without limitation, (i) enforcement of the Facility Leases by legal action, (ii) termination

of the Facility Leases and repossession of the Facilities, (iii) sale of the Owner Lessor's interest in the Facilities, and (iv) holding, keeping idle or leasing the interest of the Owner Lessor in the Facilities. Facility Leases, § 17.

15. After a Facility Lease Cross-Default and the failure of the Owner Lessor to cure such a default, the Trustee is entitled, upon written notice to the Owner Lessor, to take possession of all or any part of the Indenture Estate to the exclusion of the Owner Participant, the Owner Lessor and the Facility Lessees. Indenture § 4.3(b).

16. If, upon the occurrence of a default, the Trustee has the right to take possession of the Indenture Estate, the Owner Lessor has an obligation to cooperate with the Trustee. Specifically, Section 4.6(a) of the Indenture provides that:

> at the request of the Indenture Trustee, the Owner Lessor promptly shall (i) execute and deliver to the Indenture Trustee such instruments of title and other documents and (ii) make all such demands and give all such notices as are permitted by the terms of the Facility Leases to be made or given by the Owner Lessor upon the occurrence and continuance of a Lease Event of Default, in each case as the Indenture Trustee may deem necessary or advisable to enable the Indenture Trustee or an agent or representative designated by the Indenture Trustee, at such time or times and place or places as the Indenture Trustee may specify, to obtain possession of all or any part of the Indenture Estate the possession of which the Indenture Trustee shall at the time be entitled to hereunder.

Indenture § 4.6(a).

17. Section 4.6(b) of the Indenture grants the Trustee broad rights upon any taking of possession of all or part of its collateral, as follows:

> Upon every such taking of possession, . . . the Indenture Trustee shall have the right to deal with the Indenture Estate and to carry on the business and exercise all rights and powers of the Owner Lessor

> relating to the Indenture Estate, as the Indenture Trustee shall deem best, and, the Indenture Trustee shall be entitled to collect and receive all rents . . ., revenues, issues, income, products and profits of the Indenture Estate and every part thereof . . . and to apply the same to the management of or otherwise dealing with the Indenture Estate and of conducting the business thereof, and of all expenditures with respect to the Indenture Estate and the making of all payments which the Indenture Trustee may be required or elect to make, if any for taxes, assessments, insurance or other proper charges upon the Indenture Estate or any part thereof (including the employment of engineers and accountants to examine, inspect and make reports upon the properties and the books and records of the of the Owner Lessor and the Facility Lessees relating to the Indenture Estate and the Operative Documents), or under any provision of this Indenture, as well as just and reasonable compensation for the services of the Indenture Trustee and of all Persons properly engaged and employed by the Indenture Trustee.

Indenture § 4.6(b).

18. Upon the acceleration of the indebtedness under the Lessor Notes, the Trustee is entitled, as a matter of right, to the appointment of a receiver for all or any part of the Indenture Estate. Section 4.8 of the Indenture provides in pertinent part:

> If the outstanding principal amount of the notes shall have been declared due and payable pursuant to Section 4.3 hereof, as a matter of right, the Indenture Trustee shall be entitled to the appointment of a receiver (who may be the Indenture Trustee or any successor or nominee thereof) for all or any part of the Indenture Estate, whether such receivership be incidental to a proposed sale of the Indenture Estate or the taking of possession thereof or otherwise, and the Owner Lessor hereby consents to the appointment of such a receiver and will not oppose any such appointment. Any receiver appointed for all or any part of the Indenture Estate shall be entitled to exercise all the rights and powers with respect to the Indenture Estate to the extent instructed to do so by the Indenture Trustee.

Indenture § 4.8.

19. Pursuant to the terms of the Indenture, the Owner Lessor has waived certain legal rights with respect to the Indenture Estate. Specifically, the Owner Lessor has waived the right to seek or derive any benefit or advantage from:

> (a) any stay, extension, moratorium or other similar law; (b) any Applicable Law providing for the valuation of or appraisal of any portion of the Indenture Estate in connection with a sale thereof; or (c) any right to have any portion of the Indenture Estate or other security for the Notes marshaled.

Indenture § 4.10. The Owner Lessor has also covenanted not to interfere with the Trustee's exercise of remedies:

> The Owner Lessor covenants not to hinder, delay or impede the exercise of any right or remedy under or in respect of this Lease Indenture, and agrees, to the extent permitted by Applicable Law, to suffer and permit its exercise as though no laws or rights of the character listed above were in effect . . . .

*Id.* In addition to its commitment not to interfere with the exercise of remedies, the Owner Lessor gives further assurances in the Indenture "from time to time to do all such acts and execute all such instruments of further assurance as shall be reasonably requested by the Indenture Trustee for the purpose of fully carrying out and effectuating this Indenter and the intent hereof." Indenture § 4.14.

**DEFAULTS**

20. On December 20, 2005, Calpine filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). More than 250 of Calpine's subsidiaries and affiliates, including Tiverton Power, filed

voluntary bankruptcy petitions on December 20 and 21, 2005 (such filing entities, together with Calpine and any affiliate that subsequently filed for protection under the Bankruptcy Code, being referred to collectively herein as the "Debtors"). Rumford Power filed its bankruptcy petition a week later, on December 27, 2005. Without limitation, the bankruptcy filings by Tiverton Power, Rumford Power and Calpine constitute (a) Lease Events of Default under Section 16(g) of the Facility Leases, (b) a Lease Indenture Event of Default under Section 4.2(a) of the Indenture, and (c) an Event of Default under Section 6.1 of the Pass Through Trust Agreement.

21. On January 17, 2006, Tiverton Power and Rumford Power failed to pay the Basic Rent (as accrued through January 15, 2006) due under the Facility Leases in the aggregate amount of $16,571,721.62. The failure of the Facility Lessees to pay Basic Rent within five days of the due date is an additional Lease Event of Default under Section 16(a) of the Facility Leases and an additional Lease Indenture Event of Default under Section 4.2(a) of the Indenture. Neither Tiverton Power nor Rumford Power paid the Basic Rent due on January 17, 2006 within five days thereof.

22. On February 2, 2006, the Trustee served a notice of default on the Owner Lessor and the Owner Participant, setting forth multiple defaults under the Operative Documents arising from (i) the bankruptcy filings of Calpine, Tiverton Power and Rumford Power, (ii) the failure of Tiverton Power and Rumford Power to pay Basic Rent, and (iii) the failure of the Owner Lessor to make the required payment of interest on the Lessor Notes (the "Default Notice"). A true and correct copy of the Default Notice is attached hereto as Exhibit E.

23. Under Section 4.4 of the Indenture, the Owner Lessor has the right to cure any payment default under the Facility Leases within ten (10) days of receiving notice of such a default from the Indenture Trustee. The Owner Lessor made no payment of Basic Rent or any other amounts to the Trustee within ten days of delivery of the Default Notice.

24. On February 6, 2006, Tiverton Power and Rumford Power filed and served a notice of their intent to reject the following eight (8) agreements relating to the Facilities pursuant to Section 365 of the Bankruptcy Code (the "Rejection Notice"):

(i) Facility Lease Agreement—Tiverton;
(ii) Facility Site Sublease—Tiverton;
(iii) Memorandum of Facility Lease Agreement—Tiverton;
(iv) Memorandum of Facility Site Sublease—Tiverton;
(v) Facility Lease Agreement—Rumford;
(vi) Facility Site Sublease—Rumford
(vii) Memorandum of Facility Lease Agreement—Rumford; and
(viii) Memorandum of Facility Site Sublease—Rumford.

No notice of rejection was filed with respect to other agreements relating to the Facilities, including among others, the Site Leases or the Participation Agreement. Following the filing of the Rejection Notice, it was revealed that the Rumford Facility had been idled since November, 2005, and the Tiverton Facility had been idled since on or about February 4, 2006.

25. In response to the Rejection Notice, PMCC disclaimed any intent or responsibility to repossess and/or operate the Facilities. In fact, PMCC vehemently opposed public statements by Calpine to this effect and demanded their retraction. As described in PMCC's Limited Objection to the Rejection Notice, filed with the Bankruptcy Court on April 14, 2006 (the "Limited Objection"):

> At the same time, Calpine made a number of public statements that PMCC would take over and be responsible for operation of both facilities. These comments (all of which were both *false* and made without PMCC's knowledge or consent and with no prior communication with PMCC whatsoever) caused PMCC to receive numerous inquiries from facility vendors and taxing authorities, investors in its parent and the financial press. At PMCC's demand, Calpine quickly issued an 8-K retracting these statements, but then later commented to at least one newspaper that PMCC was liable for real estate taxes due at one of the facilities.

Limited Objection at 4 n.2 (emphasis added). Furthermore, in comments (the "Comments") filed in response to the Trustee's Motion to Withdraw the Reference as to the Rejection Notice (the "Trustee Motion to Withdraw"; Case No. 06-2939 in the United States District Court for the Southern District of New York), PMCC described itself and its affiliates as "Passive Investors" and announced that "[n]one of the Passive Investors currently has or intends to have possession or control over the Facilities." Comments, ¶ 4 at 4.

26. On March 15, 2006, the Trustee served an Enforcement Notice on Tiverton Power, Rumford Power, and the Owner Participant as described in Section 5.1 of the Indenture. A true and correct copy of the Enforcement Notice is attached hereto as Exhibit F. In the Enforcement Notice, the Trustee informed the recipients of its intention to exercise remedies under the Operative Documents on or after the date 30 days from the receipt of the Enforcement Notice by the notice parties, given the occurrence and continuance of certain enumerated defaults.

27. On May 18, 2006, the Trustee declared, by written notice to the Owner Participant and the Owner Lessor (the "Acceleration Notice"), the unpaid principal amount of the Lessor Notes and all the accrued interest thereon immediately due and payable, pursuant to and in accordance with, among other provisions, Section 4.3(a) of the

Indenture. A true and correct copy of the Acceleration Notice is attached as Exhibit G hereto.

## THE TRANSITION AGREEMENT AND THE LETTER AGREEMENT

28. After receiving the Rejection Notice, the Trustee, by and through its various agents, initiated an extensive diligence investigation in order to verify the status of its collateral and to determine what steps would be required to take possession of the Facilities and restart operations. As a result of this investigation, the Trustee concluded that the Rejection Notice, together with the method of purported surrender, implicated questions of federal law beyond the jurisdiction of the Bankruptcy Court. In keeping with this conclusion, the Trustee filed the Trustee Motion to Withdraw on or about April 13, 2006. On the following day, the Trustee filed its Objection to the Rejection Notice and the purported surrender of the Facilities in the Bankruptcy Court.

29. ISO New England, Inc. ("ISO") is a not-for-profit corporation responsible for the day-to-day reliable operation of New England's bulk power generation and transmission system. ISO also filed a Motion to Withdraw the Reference as to the Rejection Notice (the "ISO Motion to Withdraw"; Case No. 06-3097 in the United States District Court for the Southern District of New York) and filed an Emergency Motion for Expedited Consideration of the ISO Motion to Withdraw (the "Emergency Motion"). In the Emergency Motion, ISO explained that, absent an appropriate transition from the Debtors to a successor operator, the unavailability of the idled plants during summer might compromise the reliability of the New England power generation and transmission system. Emergency Motion ¶ 1 at 3. In particular, ISO cited a preliminary study

concluding "that the reliability of the New England electric power system will be adversely affected if the Rumford Facility is not operational during the peak summer months of 2006." *Id.* ¶ 14 at 7.

30. After the Trustee Motion to Withdraw was filed, the Trustee and the Debtors agreed to a temporary standstill of litigation in order to negotiate a resolution regarding the surrender of the Facilities and arrangements for an orderly transition that would permit the operation of the Facilities during the peak summer season. This negotiation addressed the transfer of certain assets that were not expressly included in the Trustee's collateral package, but are important and useful to operating the Facilities (the "Ancillary Assets"). The discussions between the Trustee and the Debtors have resulted in a Transition Agreement, a true and correct copy of which is attached as Exhibit H hereto. Among other things, the Transition Agreement contemplates that a receiver appointed for certain assets of PMCC will accept surrender of the Facilities and the transfer of the Ancillary Assets. The Transition Agreement further contemplates that the receiver will seek and obtain the necessary regulatory approvals and financing to restart operations at the Facilities.

31. In furtherance of the Transition Agreement, the Trustee entered into a side letter with the Debtors (the "Letter Agreement") regarding the fulfillment of certain conditions precedent relating to the Transition Agreement. A true and correct copy of the Letter Agreement is attached as Exhibit I hereto. The Letter Agreement provides that the Trustee shall file papers seeking the appointment of a receiver no later than May 22, 2006 and shall request that a hearing be scheduled on the motion no later than May 31, 2006. The Debtors have filed a motion seeking Bankruptcy Court approval of the Transition

Agreement (the "Approval Motion"), and a hearing to consider the approval motion is now scheduled for June 5, 2006. The Trustee is seeking the immediate appointment of a receiver on a separate Order to Show Cause in fulfillment of its obligations under the Letter Agreement.

## IMMEDIATE RELIEF NEEDED TO PREVENT IRREPARABLE HARM

32. In the absence of immediate relief, specifically, the appointment of a receiver, the Trustee will suffer irreparable harm, including, but not limited to, the following:

*Possible loss of assets that are important and useful to running the power plants*. The Transition Agreement with the Debtors provides for the acquisition of assets that are important to the restoration of the power plants to service but that were not expressly included in the Trustee's collateral. These assets include, without limitation, the land on which the power plants are located, interconnection facilities that link the power plants to the electricity grid, transformers that modulate the voltages between the grid and the plants, spare parts, emissions credits, key data relating to the plants, and software necessary to monitor the operation of the plants. The failure to appoint a receiver and consummate the Transition Agreement will jeopardize the Trustee's opportunity to acquire promptly these assets.

*Loss of summer revenues*. Without a receiver to accomplish the contemplated transition, it will be difficult to restore the plants to service any time in the near future on a commercially reasonable basis. Consequently, the Trustee will lose the substantial revenues that are customarily generated by power plants during the peak summer season.

*Loss of future revenues*. The outage of a power plant has a direct impact on future revenues. Power plant operators are entitled to capacity payments that are calculated based on the output of a plant in the previous twelve months. Absent the appointment of a receiver, the outages at the Tiverton and Rumford power plants will be extended, resulting in a loss of future revenues.

*Possible loss of key employees*. The Tiverton and Rumford power plants have been idle for some time now, and the employees at these plants have endured considerable uncertainty regarding any future employment. The delay of the transition of the plants will increase the risk of loss of key employees, who may decide to seek other opportunities rather than wait any longer for a transition to be resolved.

*Danger of physical deterioration of the power plants*. Power plants are designed to operate continuously under full load, with only periodic outages for maintenance. When plants remain idle for extended periods of time, there is an increasing risk of physical deterioration to the massive turbines and generators that produce the electricity. The failure to appoint a receiver will necessarily extend the already substantial period during which the power plants have been idle and enhance the risk of damage to the Trustee's collateral.

*Adverse impact on the marketability of the power plants*. If a receiver is not appointed, the power plants may have to remain mothballed, perhaps forcing the Trustee to sell them in idle condition. Potential bidders for these assets will necessarily discount any offers for the plants to take account of reductions in future revenues, physical degradation and the loss of access to experienced employees.

*Possible loss of the financing*. In light of the Owner Lessor's failure to make payments when due on the Notes, the Trustee does not currently have cash reserves available for the preservation of its Collateral. However, in connection with the Transition Agreement with the Debtors, certain Holders have prepared a term sheet for a financing that is essential to starting up the power plants. If a receiver is not appointed and the Transition Agreement is not consummated, the funds required to bring the plants back on line may not be available.

*Regulatory delays and complications*. Approval of the FERC will be required to bring the plants back on line under new management. FERC approval, and approval of other regulators, may be contingent upon a demonstration that there are adequate financial and operational resources to run the plants. Absent a receiver, there will be no entity to enter into financing and other counterparty arrangements necessary to obtain FERC approval.

**FIRST CLAIM FOR RELIEF**

**Request for a Receiver Under the Indenture**

33. The Trustee repeats and realleges paragraphs 1 through 32 of this Complaint, which are incorporated herein by reference.

34. Pursuant to Section 4.8 of the Indenture, quoted above in paragraph 18, the Owner Lessor consented to the appointment of a receiver upon the acceleration of the indebtedness under the Notes.

35. As set forth above in paragraphs 20, 21 and 23, the Owner Lessor has defaulted on its obligations under the Notes and has failed to cure such defaults.

36. As set forth above in paragraph 27, the Trustee has delivered the Acceleration Notice and accelerated all the indebtedness under the Notes.

37. There is an urgent need for the appointment of a receiver to take control of and to operate the Facilities.

38. In the absence of a receiver's appointment, the Trustee will suffer irreparable harm.

39. The Trustee has no adequate remedy at law.

## SECOND CLAIM FOR RELIEF

### Request for Protection of Collateral

40. The Trustee repeats and realleges paragraphs 1 through 39 of this Complaint, which are incorporated herein by reference.

41. The Rumford Facility has remained idle for approximately six months; the Tiverton Facility, for approximately three months.

42. The Facilities are not designed to remain idle for extended periods of time without risk of possible physical deterioration.

43. Failure to operate the Facilities during the summer months will result in an irretrievable loss of current and future income to the Trustee.

44. The Owner Lessor has refused to take control of and operate the Facilities.

45. There is an urgent need for the appointment of a receiver to operate the Facilities, in order to preserve and protect the Trustee's collateral.

46. In the absence of a receiver's appointment, the Trustee will suffer irreparable harm.

47. The Trustee has no adequate remedy at law.

## THIRD CLAIM FOR RELIEF

### Enforcement of the Tiverton Lessor Note

48. The Trustee repeats and realleges paragraphs 1 through 47 of this Complaint, which are incorporated herein by reference.

49. As set forth above in paragraphs 20, 21 and 23, numerous Lease Indenture Events of Default have occurred and are continuing.

50. As set forth above in paragraph 22, the Trustee delivered the Default Notice to the Owner Lessor and the Owner Participant.

51. As set forth above in paragraph 26 above, the Trustee delivered the Enforcement Notice to Tiverton Power, Rumford Power and the Owner Participant.

52. As set forth above in paragraph 27 above, the Trustee has delivered the Acceleration Notice and accelerated all the indebtedness under the Notes.

53. The Owner Lessor has failed to pay all sums due and owing to the Trustee under the Tiverton Lessor Note in breach of its obligations thereunder and under the Indenture.

54. As of May 18, 2006, the amount of principal owed under the Tiverton Lessor Note was $ 188,741,120.23. The amount of interest accrued as of May 18, 2006, exclusive of interest on unpaid principal and interest, costs of collection and other amounts due under the Indenture, is $14,344,325.14. Basic interest continues to accrue on the unpaid principal balance of the Tiverton Lessor Note at a rate of $ 47,185.28 *per diem*.

## FOURTH CLAIM FOR RELIEF

### Enforcement of the Rumford Lessor Note

55. The Trustee repeats and realleges paragraphs 1 through 54 of this Complaint, which are incorporated herein by reference.

56. As set forth above in paragraphs 20, 21 and 23, numerous Lease Indenture Events of Default have occurred and are continuing.

57. As set forth above in paragraph 22, the Trustee delivered the Default Notice to the Owner Lessor and the Owner Participant.

58. As set forth above in paragraph 26 above, the Trustee delivered the Enforcement Notice to Tiverton Power, Rumford Power and the Owner Participant.

59. As set forth above in paragraph 27 above, the Trustee has delivered the Acceleration Notice and accelerated all the indebtedness under the Notes.

60. The Owner Lessor has failed to pay all sums due and owing to the Trustee under the Rumford Lessor Note in breach of its obligations thereunder and under the Indenture.

61. As of May 18, 2006, the amount of principal owed under the Rumford Lessor Note was $ 174,833,879.79. The amount of basic interest accrued as of May 18, 2006, exclusive of interest on unpaid principal and interest, costs of collection and other amounts due under the Indenture, is $13,287,374.86. Basic interest continues to accrue on the unpaid principal balance of the Tiverton Lessor Note at a rate of $ 43,708.47 *per diem*.

## FIFTH CLAIM FOR RELIEF

### Specific Performance of the Operative Documents

62. The Trustee repeats and realleges paragraphs 1 through 61 of this Complaint, which are incorporated herein by reference.

63. There is an urgent need to restore the Facilities to operation immediately. Any delay caused by a breach of the Owner Lessor's obligations under the indenture (i) to cooperate in the return of the Indenture Estate to the Trustee pursuant to Section 4.6(a) thereof and (ii) not to interfere in the Trustee's exercise of its rights and remedies under the Indenture pursuant to Section 4.10 thereof threatens to cause the Trustee irreparable harm.

64. The Trustee has no adequate remedy at law.

65. The Trustee is therefore entitled to the entry of an injunction compelling specific performance by the Owner Lessor and the Owner Participant of their covenants and agreements under the Operative Documents, as follows:

> Defendants and their members, and their respective agents, employees, assignees, successors, representatives, and all persons acting under, in concert with, or for them:

(a) Shall promptly (i) execute and deliver to the Trustee or its designee such instruments of title and other documents and (ii) make all such demands and give all such notices as are permitted by the terms of the Facility Leases to be made or given by the Owner Lessor upon the occurrence and continuance of a Lease Event of Default, in each case as the Indenture Trustee may deem necessary or advisable to enable the Trustee, or an agent or representative designated by the Trustee, at such time or times and place or places as the Trustee may specify, to obtain possession of all or any part of the Indenture Estate the possession of which the Trustee shall at the time be entitled to hereunder; and

(b) Shall not hinder, delay or impede the exercise of any right or remedy under or in respect of the Indenture, or seek or derive any benefit or advantage from (1) any stay, extension, moratorium or similar law; (2) any law providing for the valuation or appraisal of any portion of the Indenture Estate in connection with a sale thereof; or (3) any right to have any portion of the Indenture Estate or other security marshaled.

**PRAYER FOR RELIEF**

WHEREFORE, Trustee respectfully prays that this Court:

(1) Pursuant to the First Claim for Relief, to immediately appoint a receiver on the terms set forth in the order accompanying the Plaintiff's Emergency Motion for the Appointment of a Receiver;

(2) Pursuant to the Second Claim for Relief, to immediately appoint a receiver on the terms set forth in the order accompanying the Plaintiff's Emergency Motion for the Appointment of a Receiver, for the protection of the Trustee's collateral;

(3) Pursuant to the Third Claim for Relief, enter a judgment in favor of the Trustee in the amount of (i) $ 188,741,120.23 in unpaid principal; plus (ii) $ 14,344,325.14 of interest accrued on the unpaid principal balance as of May 18, 2006 at the basic rate of 9.00%; plus (iii) further basic interest of $47,185.28 *per diem* accruing on the unpaid principal balance at the basic rate of 9.00% ; plus (iv) such other interest, or interest on interest that has or may come due under the Tiverton Lessor Note; and

(4) Pursuant to the Fourth Claim for Relief, enter a judgment in favor of the Trustee in the amount of (i) $ 174,833,879.79 in unpaid principal; plus (ii) $ 13,287,374.86 of interest accrued on the unpaid principal balance as of May 18,2006 at the basic rate of 9.00%; plus (iii) further basic interest of $43,708.47 *per diem* accruing on the unpaid principal balance at the basic rate of 9.00%; plus (iv) such other interest, or interest on interest that has or may come due under the Rumford Lessor Note; and

(5) Pursuant to the Fifth Claim for Relief, enter an injunction as follows:

Defendants and their members, and their respective agents, employees, assignees, successors, representatives, and all persons acting under, in concert with, or for them:

a. Shall promptly (i) execute and deliver to the Trustee or its designee such instruments of title and other documents and (ii) make all such demands and give all such notices as are permitted by the terms of the Facility Leases to be made or given by the Owner Lessor upon the occurrence and continuance of a Lease Event of Default, in each case as the Indenture Trustee may deem necessary or advisable to enable the Trustee, or an agent or representative designated by the Trustee, at such time or times and place or places as the Trustee may specify, to obtain possession of all or any part of the Indenture Estate the possession of which the Trustee shall at the time be entitled to hereunder; and

b. Shall not hinder, delay or impede the exercise of any right or remedy under or in respect of the Indenture, or seek or derive any benefit or advantage from (1) any stay, extension, moratorium or similar law; (2) any law providing for the valuation or appraisal of any portion of the Indenture Estate in connection with a sale thereof; or (3) any right to have any portion of the Indenture Estate or other security marshaled.

(6) Award fees and costs of collection, including, without limitation, attorneys' fees.

(7) Grant such other and further relief as this Court deems just and proper under the circumstances.

Dated: New York, New York
May 22, 2006

ROPES & GRAY LLP

By ______________________________

Keith H. Wofford (KW-2225)
Anne H. Pak (AP-3641)
1251 Avenue of the Americas
New York, New York 10020-1105
Tel: 212-596-9000
Fax: 212-596-9090

SHIPMAN & GOODWIN LLP
Ira H. Goldman (IG-5192)
Corrine L. Burnick (CB-9072)
Marie C. Pollio (MP-2664)
One Constitution Plaza
Hartford, CT 06103-1919
Telephone: 860-251-5000
Facsimile: 860-251-5312

Attorneys for U.S. Bank National Association, As Trustee